# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **DARRELL MORRIS,** | ) |
| Petitioner, | ) ) ) |
| v. | ) **Case No. CIV 11-243-RAW-KEW** |
| **JIM FARRIS, Warden,** | ) ) ) |
| Respondent. | ) |

## REPORT AND RECOMMENDATION

This matter is before the Magistrate Judge on petitioner's amended petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. Petitioner, an inmate currently incarcerated at Lexington Correctional Center in Lexington, Oklahoma, attacks his conviction in Bryan County District Court Case No. CF-2007-366 for Shooting with Intent to Kill (Count I) and Feloniously Pointing a Firearm (Counts II and III). He sets forth the following grounds for relief:

I. Petitioner contends his conviction is contrary to the Constitution of the United States on the grounds that he was denied his Sixth amendment right to effective assistance of [trial] counsel.

II. Petition [sic] further contends his conviction is contrary to the Constitution of the United States on the grounds that he was denied his Fourteenth Amendment right to effective assistance of counsel on appeal.

III. Petitioner was prejudiced by his lack of effective assistance of counsel in both instances. . . .

(Dkt. 17 at 3).

The respondent has submitted the following records to the court for consideration in

this matter:

- A. Petitioner's direct appeal brief.

- B. The State's brief in petitioner's direct appeal.

- C. Summary Opinion affirming petitioner's judgment and sentence. *Morris v. State*, No. F-2008-895, slip op. (Okla. Crim. App. Sept. 1, 2009).

- D. Petitioner's application for post-conviction relief.

- E. The State's response to petitioner's application for post-conviction relief.

- F. Petitioner's reply to the State's post-conviction response.

- G. Findings of Fact and Conclusions of Law, denying petitioner's post-conviction application. *Morris v. State*, No. CF-2007-366 (Bryan County Dist. Ct. Mar. 15, 2011).

- H. Petitioner's Petition in Error, appealing the denial of post-conviction relief.

- I. Order Denying Motion to Supplement and Affirming Denial of Post-Conviction Relief. *Morris v. State*, No. PC-2011-254, slip op. (Okla. Crim. App. June 15, 2011).

- J. Transcript of petitioner's nonjury trial proceedings.

- K. State's Exhibit 15 (compact disc).

**Standard of Review**

Under the Anti-Terrorism and Effective Death Penalty Act, federal habeas corpus relief is proper only when the state court adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

**Facts**

Petitioner and Diana Lummus met in the fall of 2006 and married in March 2007. (Tr. 94-95). Ms. Lummus brought two daughters to the marriage, who were five and fifteen years old at the time. (Tr. 95-96). The relationship between petitioner and Ms. Lummus soured soon after the wedding. (Tr. 96). According to Ms. Lummus, petitioner "became more controlling," did not like for Ms. Lummus to talk to her friends, and disapproved of the time she spent with her parents. (Tr. 96). Petitioner also began "changing what he thought about [Ms. Lummus'] daughter and how [Ms. Lummus] punished her." (Tr. 96). During this time petitioner began drinking vodka perhaps twice a week. (Tr. 96). When he was drinking, he was more argumentative and confrontational. (Tr. 97).

After 7:00 p.m. on May 22, 2007, Ms. Lummus returned home with her younger daughter from T-ball practice. (Tr. 97). Ms. Lummus cooked dinner, bathed her younger daughter, and got both children ready for bed. (Tr. 97). Ms. Lummus went to bed around 10:00 p.m. (Tr. 98). She testified that on the previous two nights, she was able to get only two or three hours of sleep because of petitioner's arguing and trying to pick fights. (Tr. 98-100).

As he had done the previous few nights, petitioner immediately began berating Ms. Lummus, telling her she "shared a brain" with her daughter and that, while Ms. Lummus' family "thought [she] was all that," she "was not shit." (Tr. 98-99). He also stared at her, saying he was "[d]iscerning [her] soul" and that they were unequivocally yoked. (Tr. 99).

3

Although on previous nights she had offered some halfhearted attempts of engaging in an argument with petitioner, she got out of bed and went in the living room, telling him she was through with putting up his behavior. (Tr. 100, 103). She testified that on that night, she "needed to sleep" and "was pregnant and just wanted him to shut up." (Tr. 99).

Petitioner followed her into the living room, holding a shotgun. (Tr. 105-07). He pointed it in her face, holding the barrel approximately 12-18 inches from her. (Tr. 108). Petitioner asked, "How do you like these issues?" (Tr. 108). Ms. Lummus told petitioner he was crazy, then pushed past him to go into her daughter's bedroom to call 911. (Tr. 109-110). She told the operator that petitioner had just put a gun in her face, and she needed someone to come to their house. (Tr. 110). While she was on the phone, she could hear petitioner "clanking" and "clicking" the shotgun, "[l]ike it was being loaded." (Tr. 111). He then returned to the bedroom, and she did not see the gun again. (Tr. 111-12). After Ms. Lummus got off the phone, petitioner continually paced back and forth between the bedroom and the kitchen sink. (Tr. 112). He told her that she had better call the police off, because "it was going to be bad" for her. (Tr. 112).

Deputy Butch Boucher of the Bryan County Sheriff's Department, the first officer to arrive at the scene, met Ms. Lummus at the back door of the house. (Tr. 113-114). After speaking briefly with Ms. Lummus outside, Deputy Boucher entered the back door and went into the house with her and found that petitioner had shut himself in the bedroom. (Tr. 114-15). Boucher spoke with petitioner through the closed door, and petitioner invited Boucher to come in. (Tr. 115-16). Boucher tried to open the door, but it was locked. (Tr. 115). Ms. Lummus searched for her key to the bedroom door, which she kept on her keychain. (Tr. 116-17). When she located the keychain, she found the key to the bedroom door had been

4

removed. (Tr. 116-17). Boucher continued speaking with petitioner through the locked door for approximately five minutes, and other law enforcement officers arrived outside. (Tr. 117). Petitioner told Boucher that if the police tried to enter the bedroom, he would shoot. (Tr. 117). Ms. Lummus was instructed on how to safely retrieve her children and leave the property. (Tr. 117-18). She gave consent to the police to search her house and walked with her daughters to her parents' house nearby. (Tr. 118).

Kenneth Golden, the Bryan County Undersheriff, met up with Boucher and Deputy Nave outside the house. (Tr. 141-42). While Golden still was outside, he received a phone call from petitioner, who had been patched through to the officers by an operator. (Tr. 142-43). Petitioner told Golden that the officers "had no right there, that it was his home and [the officers] needed to leave." (Tr. 143). Petitioner said his dispute with his wife was his problem, and "he would take care of it." (Tr. 143-44).

Undersheriff Golden told petitioner that if he had a gun, he needed to put it down and come outside. (Tr. 144). Golden asked petitioner several times if it would be all right if he came into the house so they could speak, but petitioner repeatedly responded, "Come get you some." (Tr. 144). Golden asked for clarification: "What does that mean? You know, are you going to shoot me when I come in?" (Tr. 144). Petitioner said, "Yes, come get you some." (Tr. 144). Golden had approximately six telephone conversations with petitioner, each lasting only about a minute. (Tr. 144).

Undersheriff Golden called Bryan County Sheriff Bill Sturch for assistance. (Tr. 165-66). Sheriff Sturch arrived at the scene at approximately 2:30 a.m. (Tr. 166). The officers called petitioner a few times, but he refused to speak with them. (Tr. 167). Sturch and the other officers spoke with Ms. Lummus about the layout of the house, then decided to enter

5

the house through a door on the west side. (Tr. 167).

Sheriff Sturch, Undersheriff Golden, Deputy Boucher, and Deputy Nave entered the house. (Tr. 145, 167-69). Sturch approached petitioner's bedroom door and began speaking to him through the door. (Tr. 146, 169). Sturch told petitioner that the officers needed to talk to him "to find out his side of the story of what had gone on earlier in the evening between he [sic] and his wife." (Tr. 169). Petitioner said it "was his house and . . . he didn't have to come out and was not going to come out." (Tr. 170). Petitioner also told Sturch to "bring it on." (Tr. 170).

After a few minutes of this attempt at conversation, the barrel of a shotgun appeared through a hole in the bedroom door where a deadbolt lock had been removed. (Tr. 146, 169). The shotgun was pointed at Sheriff Sturch, who quickly moved to one side to avoid being shot. (Tr. 147, 169, 171). Sturch and the other officers remained in the house a few more minutes, trying to get petitioner to come out. (Tr. 171-72). Petitioner refused, so the officers exited the house. (Tr. 172).

By that time Lieutenant Dennis Flowers of the Oklahoma Highway Patrol (OHP) had arrived on the scene. (Tr. 172, 184). After a final phone call with petitioner, in which petitioner again insisted "he wasn't coming out" and exhorted the officers to "bring it on," Sturch spoke with Lt. Flowers. (Tr. 172-73). Flowers told Sturch that he could call the OHP swat team, reasoning that their training in handling such situations probably would make them better qualified to handle this situation with petitioner. (Tr. 172). Sheriff Sturch agreed and handled over the primary control of the situation to the OHP. (Tr. 172).

OHP Trooper Steven Nabors arrived shortly thereafter to head the negotiation with petitioner. (Tr. 183-84). After a briefing by Lt. Flowers, Nabors attempted to make contact

6

with petitioner through a public address system in an armored OHP vehicle. (Tr. 184-86). The vehicle was positioned a few feet away from the north door to the house, with its emergency lights and headlights illuminating the north side of the house. (Tr. 184-87). A marked police car was positioned on the opposite side of the house, with its emergency lights on. (Tr. 350-51). Nabors could not see inside the house, because the curtains or shades were closed. (Tr. 192). At approximately 3:30 a.m., Trooper Nabors asked petitioner through the public address system to come to the window without his weapon, so he and Nabors could talk. (Tr. 187, 191). Petitioner did not respond. (Tr. 191).

Almost two hours later, with petitioner still refusing to speak with officers outside the house, the OHP tactical team broke one of the windows of the bedroom, so they could deploy a "throw phone" for petitioner to speak to Nabors. (Tr. 192-93, 257, 299, 358-59). The throw phone also could pick up any audio inside the house. (Tr. 359-60). Petitioner refused to pick up the phone, but the open microphone on it picked up his reaction: "Who wants the first bullet, then God dammit? I ain't done nothing. Break my window. Come on. Bullshit." (Tr. 365). Trooper Nabors was told to make one last announcement over the public address system to advise petitioner that the OHP "had probable cause to be there, that he was under arrest and needed to come out without being armed with his hands raised." (Tr. 194-95). The throw phone picked up petitioner's reaction: "Come on, it ain't happening." (Tr. 366).

After petitioner again failed to come out of the house, a member of the OHP tactical team deployed a smoke canister through the window. (Tr. 196-97), 260, 301-02). In response, petitioner fired his 12-gauge shotgun twice through the north door of the house, in the direction of the OHP vehicle. (Tr. 197-98, 201, 230, 233-35, 261, 303-05, 334, 361-62; State's Trial Exhibit 2). The second shotgun slug narrowly missed the head of OHP Trooper

7

Scott Hampton. (Tr. 261-62). The troopers took cover behind the armored vehicle. (Tr. 305-06). The OHP did not return fire, instead deploying two additional smoke canisters into the house. (Tr. 305-06). The tactical team then entered the house and discovered petitioner on the floor in the kitchen area. (Tr. 265-66). It was apparent that the gas was affecting petitioner. (Tr. 267). Petitioner was placed into custody and removed from the house. (Tr. 267).

Once outside, petitioner was checked by emergency medical personnel who already were on the scene. (Tr. 368). His pockets were emptied and the contents catalogued. (Tr. 368-69). The troopers discovered two sets of keys and a wallet. (Tr. 369). The wallet contained an Oklahoma driver's license, some photographs, a few personal items, insurance cards, cash, and three 12-gauge shotgun slug rounds. (Tr. 369-70).

Between 5:00 a.m. and 6:00 a.m., Johnny Fairres, another state trooper, arrived on the scene. (Tr. 314). Trooper Fairres was instructed by OHP Captain Ronnie Hampton to take petitioner to a hospital in Durant. (Tr. 315). Before going to the hospital, however, Fairres read petitioner his *Miranda* rights, and petitioner stated he understood his rights. (Tr. 315-17). Fairres asked petitioner if he wanted to make a statement, and he replied, "Tape it." (Tr. 317). Fairres already had an audio recorder running and told petitioner he was recording. (Tr. 317).

Trooper Fairres asked petitioner what happened. (Tr. 322). Petitioner stated that his window had been broken, and he was defending himself. (Tr. 322). He admitted firing the shotgun, but denied pointing a gun at Ms. Lummus. (Tr. 322-23, 325). He also admitted that he heard the officers asking him to come outside, but insisted that "he was asleep on his bed and that police attacked him by breaking his window." (Tr. 324-25). When asked why he

8

had refused to come outside, petitioner would only state that "it was his house." (Tr. 325). During the interview, Trooper Fairres smelled alcohol on petitioner's breath, and petitioner's eyes appeared to be bloodshot. (Tr. 325). Fairres believed petitioner was evasive in his responses to some of the questions. (Tr. 327). For example, in response to a question about what petitioner had been drinking, petitioner stated, "That dog don't hunt." (Tr. 328). His blood alcohol content was measured at .313. (Tr. 401-402, 413-15).

**Evidentiary Hearing**

Petitioner has requested an evidentiary on all grounds for relief raised in the amended petition. The court, however, finds he has failed to show he meets the requirements for an evidentiary hearing:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>
> (A) the claim relies on--
>
> (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

**Ineffective Assistance of Counsel**

"There is a strong presumption that counsel provided effective assistance of counsel, and a habeas petitioner has the burden of proof to overcome that presumption." *United*

*States v. Rantz*, 862 F.2d 808, 810 (10th Cir. 1988) (citing *United States v. Cronic*, 466 U.S. 648, 658 (1984)), *cert. denied*, 489 U.S. 1089 (1989). To prevail on his claims of ineffective assistance of counsel, petitioner must show that (1) his counsel's performance fell below an objective standard of reasonableness, *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id*. at 694. The *Strickland* test also applies to appellate counsel. *Evitt v. Lucey*, 469 U.S. 387, 393-400 (1985).

Petitioner alleges in his amended petition that trial counsel was ineffective in failing to develop more fully the argument that petitioner was too intoxicated to form the intent to kill. He asserts physicians should have been called to testify as expert witnesses. He further claims trial counsel was ineffective in failing to call character witnesses or allowing petitioner to testify. Petitioner further asserts his appellate counsel was ineffective in failing to raise a claim of ineffective assistance of trial counsel on direct appeal.

The record shows that petitioner did not raise any claims of ineffective assistance of trial counsel on direct appeal. *See Morris v. State*, No. F-2008-895, slip op. (Okla. Crim. App. Sept. 1, 2009). Instead, he first raised his claims of ineffective trial and appellate counsel in his application for post-conviction relief. The trial court denied relief, finding that (1) petitioner had not raised any issue that could not have been raised on direct appeal, (2) the issues that could have been raised on direct appeal were either waived or barred by *res judicata*, and (3) petitioner had failed to show his appellate counsel was ineffective. *Morris v. State*, No. CF-2007-366, slip op. at 1-2 (Bryan County Dist. Ct. Mar. 15, 2011).

The Oklahoma Court of Criminal Appeals (OCCA) affirmed the denial of post-conviction relief, finding that petitioner's claims of ineffective assistance of trial counsel

were procedurally barred. *Morris v. State*, No. PC-2011-252, slip op. at 3 (Okla. Crim. App. June 15, 2011). Regarding petitioner's claim of ineffective assistance of appellate counsel, the appeal record did not indicate that petitioner had provided a copy of appellate counsel's Brief-in-Chief or other documents filed by appellate counsel in the direct appeal. *Id*. Petitioner, therefore, had "offered no definitive proof about what his appellate counsel did or did not raise on appeal or proof of what arguments counsel advanced on appeal outside of that which can be discerned from review of this Court's Summary Opinion that was on file before the District Court." *Id*.

> Petitioner's claim against his appellate counsel is that she failed to raise issues of ineffective assistance of trial counsel. Most if not all of Petitioner's ineffective-assistance-of-trial-counsel issues were regarding acts or omissions by trial counsel that would have produced evidence that Petitioner believes would have mitigated against a finding of the specific intent necessary for his conviction. The Summary Opinion from Petitioner's direct appeal reveals his appellate counsel's first proposition raised a sufficiency of the evidence claim concerning proof of specific intent. In addressing that proposition of error, this Court found the evidence presented at trial was sufficient for the finder of fact to find specific intent. Without examining that which was filed on appeal by Petitioner's appellate counsel, there can be no determination if Petitioner's post-conviction claims of alleged trial counsel ineffectiveness about specific intent evidence would have made any difference whatsoever in this Court's appellate decision that the State's evidence was sufficient for conviction. Absent proof of a different result, a defendant cannot establish a claim of ineffective assistance. Petitioner therefore has not established error in the District Court's conclusion that he did not prove his appellate counsel ineffective. Moreover, without examining that which was filed on appeal by Petitioner's appellate counsel, it cannot be discerned with certainty whether appellate counsel omitted one or more of Petitioner's post-conviction issues or inadequately raised them.

*Morris*, No. PC-2011-254, slip op. at 3-4 (citing *Strickland*, 466 U.S. at 694; *Clayton v. State*, 892 P.2d 646, 654-55) (Okla. Crim. App. 1995)) (footnote omitted).

But even if this Court, for the sake of argument, were to assume that

appellate counsel omitted or inadequately raised one or more of the issues now raised on post-conviction, any failure to have adequately raised those issues does not alone prove ineffective assistance. "As we have held many times, failure [of appellate counsel] to raise even a meritorious claim does not, in itself, constitute deficient performance." "The fact the original appellate counsel did not raise every issue now raised by post-conviction counsel . . . is not evidence of ineffectiveness." As Petitioner does not demonstrate that he was deprived on appeal of the assistance of counsel that is required by the Constitution, he does not show error occurring in the District Court denying him relief on his claim of ineffective assistance of appellate counsel. For these reasons, the District Court's order denying Petitioner's Application for Post-Conviction Relief must be affirmed.

*Morris*, No. PC-2011-254, slip op. at 4-5 (footnotes and citations omitted).

> When a habeas petitioner alleges that his appellate counsel rendered ineffective assistance by failing to raise an issue on direct appeal, we first examine the merits of the omitted issue. If the omitted issue is meritless, then counsel's failure to raise it does not amount to constitutionally ineffective assistance. *See Parker v. Champion*, 148 F.3d 1219, 1221 (10th Cir. 1998) (citing *Cook*, 45 F.3d at 392-93), *cert. denied*, 525 U.S. 1151 (1999)). If the issue has merit, we then must determine whether counsel's failure to raise the claim on direct appeal was deficient and prejudicial. *See Cook*, 45 F.3d at 394.

*Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir. 1999).

**Intoxication**

Petitioner argues that appellate counsel should have raised a claim that trial counsel was ineffective in failing to investigate more fully and develop an argument that petitioner was too intoxicated to form the intent to kill. Petitioner asserts trial counsel should have fully investigated and raised an involuntary intoxication defense, because petitioner did not know or understand the prescription drug Ambien remained in his system to a degree that it could affect his body chemistry and mental processes. According to petitioner, appellate counsel also should have raised trial counsel's failure to call physicians to testify on these issues. Petitioner first presented these claims concerning his intoxication in his application for post-

conviction relief. (Dkt. 22-4 at 4-5).

The record shows petitioner had an expert witness testify that petitioner was too intoxicated to form the intent to kill. The defense called Bill Sharp, Ph.D., a licensed clinical psychologist with approximately 20 years of alcohol and drug-related experience. (Tr. 422). The court recognized Dr. Sharp as an expert in psychology and alcohol and drug-related conditions. (Tr. 425). Dr. Sharp testified he had some of petitioner's medical records prior to interviewing him and administering a battery of psychological tests. (Tr. 425-26). Dr. Sharp's evaluation included assessments of petitioner's social, medical, and possible treatment history, as well as his family background, possible emotional issues, cognitive function, and intelligence. (Tr. 426-28).

Dr. Sharp found petitioner was seeking attention and was "very needy, . . . very worried, upset, [and] seemed to be concerned that [Dr. Sharp] was going to miss him in the crowd in some way." (Tr. 428). Petitioner had an accident while in high school that resulted in his losing part of his hand and more than 15 subsequent surgeries. (Tr. 429). Petitioner had been taking "a lot of pain medication over the years." (Tr. 430). He suffered from reduced kidney function, migraine headaches, and Hepatitis C, all of which could be related to his medical history and drugs. (Tr. 430). There also was a family history for substance abuse. (Tr. 430). At the time of the evaluation, petitioner was taking Prevacid for an ulcer; Flexeril, a muscle relaxant; Tramadol for pain; Lodine for back pain; a generic antihistamine, a generic medication for high blood pressure; and in the past, at least one sedating sleep medication. (Tr. 431-32). The hospital records from the day of the incident at issue showed a high alcohol level of 0.313 in his blood. (Tr. 433). Dr. Sharp opined that "at the time, [petitioner] likely did not have sufficient ability to form intent for--related to the initiation

of the events." (Tr. 436).

Petitioner now argues that trial counsel should have called medical doctors in addition to, or instead of, a clinical psychologist. The question of which witnesses to call, however, is a matter of trial strategy, and "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotations omitted).

The issue at trial was whether petitioner had the mental capacity to form the intent to kill, and petitioner has presented no evidence that a medical doctor would have ben better qualified than a licensed psychologist to testify on the matter. Furthermore, petitioner has failed to show that if medical doctors had testified, they would have testified that he lacked the ability to form the intent to kill. *See Tafoya v. Tansy*, No. 00-2049, 9 Fed. Appx. 862, 871 (10th Cir. May 24, 2001) (unpublished) ("Speculation about what an expert could have said is not enough to establish prejudice.") (quoting *Grisby v. Blodgen*, 130 F.3d 365 373) (9th Cir. 1997)).

More important, petitioner's counsel on direct appeal raised and extensively argued the issue that petitioner's prescription sleep medication Ambien, coupled with his intoxication and reduced liver function, robbed him of the capacity to form the intent. (Docket No. 22-1 at 16-27). Appellate counsel framed the issue as one of sufficiency of the evidence, but the theory of intoxication was presented to the OCCA on direct appeal and rejected. The court finds petitioner has not shown a reasonable probability that there would have been a different outcome if the issue had been framed differently. *See Hooks v. Workman*, 606 F.3d 715, 724 (10th Cir. 2010) (Under *Strickland*'s prejudice prong, a petitioner "must establish that but for counsel's errors, there is a reasonable probability the

result of the proceeding would have been different.").

Petitioner also alleges his appellate counsel was ineffective in failing to argue that trial counsel was ineffective in his failure to investigate more fully "the bizarre side effects of Ambien," perhaps by looking at the Physician's Desk Reference or Google. Again, petitioner's claim is based on mere speculation, and he has presented no evidence that trial counsel did not investigate these resources or that the result of the trial would have been different if the Ambien claim had been researched more fully.

After careful review, the court finds the OCCA's determination of this claim was not contrary to, or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). The court further finds the OCCA's decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Petitioner has failed to show that a claim of ineffective assistance of trial counsel regarding the intoxication issue would have succeeded or that appellate counsel was ineffective in failing to pursue this claim. Therefore this ground for relief fails.

**Procedural Bar**

The respondent alleges petitioner's remaining claims of ineffective assistance of appellate counsel are procedurally barred, because with the exception of his ineffective assistance of appellate counsel claim regarding the intoxication issue, none of the ineffective assistance of appellate counsel claims were *properly* presented in petitioner's post-conviction appeal. The unexhausted claims, therefore, are subject to an anticipatory procedural bar.

"A threshold question that must be addressed in every habeas case is that of exhaustion." *Harris v. Champion*, 15 F.3d 1538, 1554 (10th Cir. 1994).

> The exhaustion requirement is satisfied . . . "once [a] federal claim has been fairly presented to the state courts." *Castille v. Peoples*, 489 U.S. 346, 351

(1989) (quoting *Pickard v. Connor*, 404 U.S. 270, 275 (1971)). . . . "[W]here the claim has been presented for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor, [r]aising the claim in such a fashion does not, for the relevant purpose, constitute fair presentation." *Id*. at 351.

*Parkhurst v. Shillinger*, 128 F.3d 1366, 1368-69 (10th Cir. 1997).

Because the ineffective assistance of counsel claims regarding trial counsel's alleged failure to allow petitioner to testify and mitigation evidence from character witnesses are based on different reasons than the claim concerning intoxication, the new claims are unexhausted. *See Bland v. Sirmons*, 459 F.3d 999, 1011-12 (10th Cir. 2006). A claim has been exhausted when it has been "fairly presented" to the state court. *Picard v. Connor*, 404 U.S. 270 (1971). "Fair presentation" means that the petitioner has raised the "substance" of the federal claim in state court. *Id*. at 278.

Petitioner argues he did present his claims of ineffective assistance of trial counsel regarding his testimony and character witnesses. The record, however, shows he did not raise these claims until he filed his appeal of the denial of post-conviction relief. (Dkt. 22-8 at 23). Furthermore, he has not presented any facts supporting these claims or showing how the omitted evidence would have changed the outcome of his trial.

In *English v. Cody*, 146 F.3d 1257, 1264 (10th Cir. 1998), the Tenth Circuit Court of Appeals held that Oklahoma's procedural bar would apply to claims of ineffective assistance of trial counsel when trial and appellate counsel are different, and the ineffective assistance of trial counsel issue can be resolved on the trial record. Here, the procedural bar applies to petitioner's ineffective assistance of trial counsel claims, because (1) he was represented by different counsel at trial and on direct appeal, and (2) regardless of whether his ineffective assistance of trial counsel claims can be resolved on the record alone, at the time of direct

appeal a procedure existed to allow remand of specific claims to the district court for supplementation of the record. *Cannon v. Mullin*, 383 F.3d 1152, 1174-75 (10th Cir. 2004), *cert. denied*, 544 U.S. 928 (2005). *See also* Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App.

A careful review of the record shows these unexhausted claims are subject to an anticipatory procedural bar, because any attempt to present the claims in state court in another post-conviction application would be procedurally barred under state law. *See Cummings v. Sirmons*, 506 F.3d 1211, 1222-23 (10th Cir. 2007), *cert. denied*, 554 U.S. 907 (2008) (explaining anticipatory procedural bar); Okla. Stat. tit. 22, § 1086.

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

"'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him." *Coleman*, 501 U.S. at 753. With respect to the "prejudice" prong of the "cause and prejudice" requirement, a petitioner "must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). Here, the court finds that application of the procedural bar by the Court of Criminal Appeals was based on state procedural rules, and petitioner has not met the requirements of a showing of cause and prejudice.

17

The court further finds that petitioner has failed to demonstrate that application of the procedural bar will result in a fundamental miscarriage of justice. The Tenth Circuit Court of Appeals has held that "[c]ases involving a fundamental miscarriage of justice 'are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime.'" *Gilbert v. Scott*, 941 F.2d 1065, 1068 n.2 (10th Cir. 1991) (citing *McClesky v. Zant*, 499 U.S. 467, 494 (1991)). Petitioner has not made a "colorable showing of factual innocence" for the purpose of establishing that failure to consider the claims would lead to a fundamental miscarriage of justice. *See Demarest v. Price*, 130 F.3d 922, 941 (10th Cir. 1997).

**ACCORDINGLY**, the Magistrate Judge recommends that this action be, in all respects, dismissed.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the parties are given fourteen (14) days from being served with a copy of this Report and Recommendation to file with the Clerk of the Court any objections with supporting briefs. Failure to file timely written objections to the Magistrate Judge's recommendations may result in waiver of appellate review of factual and legal questions. *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

**DATED** this 27th day of August 2014.

**KIMBERLY E. WEST**
**UNITED STATES MAGISTRATE JUDGE**